# United States District Court

NORTHERN DISTRICT OF GEORGIA

ORIGINAL

UNITED STATES OF AMERICA
v.

MONYETTE MCLAURIN

**CRIMINAL COMPLAINT**

CASE NUMBER: 1:13-MJ-172

FILED IN CHAMBERS
FEB 11 2013
U.S. MAGISTRATE JUDGE
N.D. GEORGIA

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. In January 2013, in DeKalb County and elsewhere in the Northern District of Georgia, the defendant did,

attempt to possess with intent to distribute cocaine, a Schedule II controlled substance, and possess a firearm in furtherance of a drug trafficking crime

in violation of Title 21, United States Code, Section 841 and Title 18, United States Code, Section 924(c).

I further state that I am a agent of the Federal Bureau of Investigation (FBI) and that this complaint is based on the following facts:

See Attached Affidavit

Continued on the attached sheet and made a part hereof.        (X) Yes ( ) No

Signature of Complainant
James P. Hosty, IV

Based upon this complaint, this Court finds that there is probable cause to believe that an offense has been committed and that the defendant has committed it. Sworn to before me, and subscribed in my presence

February 11, 2013                        at    Atlanta, Georgia
Date                                             City and State

Alan J. Baverman
United States Magistrate Judge
Name and Title of Judicial Officer              Signature of Judicial Officer
AUSA Brent A. Gray

## AFFIDAVIT IN SUPPORT OF ARREST WARRANT
## FOR MONYETTE MCLAURIN

I, James P. Hosty, IV, being duly sworn, depose and state the following:

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed for approximately 7 years. I am currently assigned to the Atlanta, Georgia office and work on the Civil Rights/Human Trafficking/Public Corruption Squad, which has the responsibility for investigating police corruption, among other federal crimes. I am a law enforcement officer of the United States, FBI, U.S. Department of Justice, within the meaning of Title 18, United States Code, Section 3052, which includes being an officer of the United States who is empowered by law to conduct investigations and make arrests for offenses pursuant to Title 18, United States Code, Section 3052.

2. During my law enforcement career, I have participated in dozens of investigations relating to drug trafficking and police corruption. I have received specialized training in the methods and techniques used by drug trafficking organizations. I have debriefed many witnesses and confidential informants about drug trafficking generally, as well as the specific practice of employing corrupt law enforcement officers as part of a drug trafficking scheme. Through this training and experience, I have become familiar with many of the patterns of activity exhibited by drug traffickers. Except where I state that I am relying on my training and experience as described here, the information in this affidavit is based on information and belief, the source of that information and basis for that belief being my own investigation and information obtained by other law enforcement agents.

3. I submit this affidavit in support of a warrant for the arrest of MONYETTE MCLAURIN for attempted possession with the intent to distribute cocaine in violation of Title 21,

United States Code, Section 841, and possession of a firearm in furtherance of a drug trafficking crime in violation of Title 18, United States Code, Section 924(c).

## BACKGROUND OF INVESTIGATION

4.      Based on my training and experience, I know that sophisticated drug trafficking groups distribute narcotics using a variety of covert methods that are designed to avoid detection by law enforcement and others. If detected, they are aware law enforcement will seize the drugs and money and arrest them. They also know that other drug dealers or criminal groups will rob them, if given a chance, stealing both the drugs and money. In the worst case, drug deals can turn violent.

5.      Given these risks, drug traffickers occasionally attempt to enlist law enforcement officers to provide protection both for them and the drug transactions they conduct. In employing corrupt police officers at a drug deal, the traffickers hope to prevent rival groups from intervening and ultimately stealing their drugs and the drug proceeds. Additionally, they hope to keep legitimate law enforcement at bay by positioning a visible law enforcement presence at or near the drug transactions. In these cases, drug traffickers are willing to pay thousands of dollars to corrupt law enforcement officers who will provide protection for these transactions.

6.      In August, 2011, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) was investigating a street gang in the Metro Atlanta area. During the course of that investigation, a confidential informant (CI-1) provided information about the gang's criminal activities. CI-1 told federal agents that police officers were involved in protecting the gang's activities, including their drug trafficking crimes. In general, these police officers, in uniform, driving police vehicles or otherwise displaying indicia of their positions, protected the drug dealers from being detected or arrested by other law enforcement officers and from being robbed by other drug dealers. The

information provided to federal agents by CI-1 regarding the use of law enforcement officers to protect drug deals is consistent with my experience and training in the investigation of similar cases.

7. CI-1, who had been working with federal agents since August, 2011, communicated to gang members and their associates that CI-1 would need police protection for his/her upcoming drug transactions. Shortly thereafter, Shannon Bass, Jerry B. Mannery, Jr., and Elizabeth Coss, none of whom are law enforcement officers, began identifying to CI-1 law enforcement officers interested in protecting his/her drug deals. Once those individuals were identified, information regarding the location and circumstances of the proposed drug deals was relayed to CI-1 and/or Shannon Bass, Jerry B. Mannery, Jr., Elizabeth Coss for him/her to pass along to law enforcement officers who expressed an interest in protecting the drug transactions.

## FACTS ESTABLISHING PROBABLE CAUSE

8. On two separate occasions, in or about January, 2013, MONYETTE MCLAURIN, a former jail officer with the DeKalb County Sheriff's Office (DCSO), provided protection for what he believed to be drug transactions involving multiple kilograms of cocaine.

9. MONYETTE MCLAURIN worked as a jail officer with DCSO from October, 1997 until April, 2011. He is currently certified by the Georgia Peace Officer Standards and Training (POST) Council and is considered eligible for employment as a law enforcement officer.

10. <u>Conversations Between December 18, 2012 and January 1, 2013.</u> On or between December 18, 2012 and January 1, 2013, Shannon Bass and Gregory Lee Harvey engaged in a number of conversations during which Harvey told Bass that he knew of police officers, in addition to himself, who would be interested in assisting in the protection of illegal drug transactions.

11. <u>Meeting on January 2, 2013.</u> On January 2, 2013, FBI agents surveilled a meeting between Harvey, Bass and MONYETTE MCLAURIN at Marlowe's Tavern, 4156 Lavista Road,

Tucker, Georgia. During this meeting, MONYETTE MCLAURIN falsely represented that he was a deputy with the DCSO. MONYETTE MCLAURIN agreed to assist Harvey in protecting Bass's future cocaine transactions in exchange for payment. Additionally, MONYETTE MCLAURIN and Harvey discussed an individual who they believed may be aware of Harvey's recent criminal activity. Harvey and MONYETTE MCLAURIN discussed killing that individual if the individual reported the activity.

12.     Drug Transaction on January 3, 2013. On January 3, 2013, FBI agents surveilled a meeting between MONYETTE MCLAURIN, Harvey and Bass in a parking lot located at 4606 Memorial Drive, Decatur, Georgia. During this meeting, Bass directed Harvey to a parking lot of a Target Store to watch the parking lot to make sure it was a safe place to conduct a drug transaction and that there was no law enforcement present. MONYETTE MCLAURIN and Bass then got into Bass's vehicle, and Bass drove to a warehouse in Chamblee, Georgia. During their drive to the warehouse, MONYETTE MCLAURIN discussed the need for the two to agree on a signal that Bass could give MONYETTE MCLAURIN in case Bass felt endangered during the transaction. MONYETTE MCLAURIN volunteered that if given a signal, he would be willing to shoot the buyer if necessary. Simultaneously, Harvey drove his personal vehicle to a Target Store, 4241 Lavista Road, Tucker, Georgia. Once at the warehouse, Bass told MONYETTE MCLAURIN that Bass was going into the warehouse to retrieve a quantity of cocaine that was to be sold in the drug transaction in the Target Store parking lot. Bass told MONYETTE MCLAURIN to stand watch while Bass was inside the warehouse. FBI agents then observed MONYETTE MCLAURIN, standing outside the warehouse wearing a DCSO uniform, badge and a firearm in a holster on his belt. When Bass returned to his vehicle with a bag, both MONYETTE MCLAURIN and Bass got into Bass's vehicle. Bass handed MONYETTE MCLAURIN the bag. Bass then asked MONYETTE MCLAURIN to

count the number of kilograms of cocaine in the bag. MONYETTE MCLAURIN did so and told Bass that there were three inside. Bass and MONYETTE MCLAURIN drove to the aforementioned Target Store where Harvey was waiting. Within minutes, CI-6 arrived and parked his/her vehicle near Bass's vehicle. Bass then got into CI-6's vehicle and Bass gave CI-6 the bag containing three kilograms of counterfeit cocaine. Then, CI-6 gave Bass a back pack containing $6,000. During this transaction, FBI agents observed Harvey parked near the drug transaction and MONYETTE MCLAURIN standing just outside Bass's vehicle, watching the transacation. Once this transaction was complete, Bass returned to his vehicle and MONYETTE MCLAURIN got into Harvey's vehicle. Bass, Harvey, and MONYETTE MCLAURIN left the Target Store parking lot and drove immediately to a parking lot located at 4606 Memorial Drive, Decatur, Georgia. There, Bass handed Harvey the payment of $6,000 which was to be shared with MONYETTE MCLAURIN. This transaction was audio and video recorded.

13. <u>Drug Transaction on January 10, 2013.</u> On January 10, 2013, FBI agents surveilled a meeting between MONYETTE MCLAURIN, Harvey and Bass in a parking lot located at Mr. Cues Billiards, 3541 Chamblee Tucker Road, Atlanta, Georgia. During this meeting, Bass directed Harvey to a parking lot of a Publix Store to watch the parking lot to make sure it was a safe place to conduct a drug transaction and that there was no law enforcement present. Then, MONYETTE MCLAURIN and Bass got into Bass's vehicle and Bass drove to a warehouse in Chamblee, Georgia. Simultaneously, Harvey drove his personal vehicle to the Publix Store, 2162 Henderson Mill Road, Atlanta, Georgia. Once at the warehouse, Bass told MONYETTE MCLAURIN that Bass was going into the warehouse to retrieve a quantity of cocaine that was to be sold in the drug transaction in the Publix Store parking lot. Bass told MONYETTE MCLAURIN to stand watch while Bass was inside the warehouse. FBI agents then observed MONYETTE MCLAURIN standing outside the

warehouse wearing a DCSO uniform and a firearm in a holster on his belt. When Bass returned to his vehicle with a bag, both MONYETTE MCLAURIN and Bass got into Bass's vehicle. Bass handed MONYETTE MCLAURIN the bag which contained three kilograms of counterfeit cocaine. Bass then asked MONYETTE MCLAURIN to count the number of kilograms of cocaine in the bag. MONYETTE MCLAURIN did so and told Bass that there were three inside. Bass and MONYETTE MCLAURIN drove to the aforementioned Publix Store where Harvey was waiting. Within minutes, CI-6 arrived and parked his/her vehicle near Bass's vehicle. Bass then got into CI-6's vehicle and Bass gave CI-6 the bag containing three kilograms of counterfeit cocaine. Then, CI-6 gave Bass a back pack containing $6,000. During this transaction, FBI agents observed Harvey parked near the drug transaction and MONYETTE MCLAURIN standing just outside Bass's vehicle, watching the transaction. Once this transaction was complete, Bass returned to his vehicle and MONYETTE MCLAURIN got into Harvey's vehicle. Bass, Harvey, and MONYETTE MCLAURIN left the Publix Store parking lot and drove immediately to the parking lot of Mr. Cue's Billiards, 3541 Chamblee Tucker Road, Atlanta, Georgia. There, Bass handed Harvey a payment of $6,000 which was to be shared with MONYETTE MCLAURIN. This transaction was audio and video recorded.

14. In communications leading up to and through the above-described drug transactions, the drug involved was described to MONYETTE MCLAURIN as cocaine.

## CONCLUSION

15. Based on the foregoing, I submit there is probable cause to believe that MONYETTE MCLAURIN attempted to possess with the intent to distribute cocaine in violation of Title 21, United States Code, Section 841, and possessed a firearm in furtherance of a drug trafficking crime in violation of Title 18, United States Code, Section 924(c).